**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | | |
|---|---|---|
| JAMES VINCENT DELONG, | ) | No. CV 14-3346-PLA |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION AND ORDER** |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) ) ) | |
| Defendant. | ) ) | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on May 8, 2014, seeking review of the Commissioner's denial of his application for Disability Insurance Benefits.  The parties filed Consents to proceed before the undersigned Magistrate Judge on May 16, 2014, and May 29, 2014.  Pursuant to the Court's Order, the parties filed a Joint Stipulation on December 29, 2014, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## <u>BACKGROUND</u>

Plaintiff was born on August 10, 1958.  [Administrative Record ("AR") at 17, 161.]  He has past relevant work experience as a truck driver and as a stone cutter.  [AR at 17, 62.]

On November 3, 2010, plaintiff filed an application for a period of disability and disability insurance benefits ("DIB"), alleging that he has been unable to work since April 1, 2010.[1]  [AR at 11, 161-63.]  After his application was denied initially, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR at 95-96.]  A hearing was held on December 11, 2012, at which time plaintiff appeared represented by an attorney, and testified on his own behalf.  [AR at 48-76.]  A vocational expert ("VE") also testified.  [AR at 62-75.]  On January 7, 2013, the ALJ issued a decision concluding that plaintiff was not under a disability from April 1, 2010, through December 31, 2010, the date last insured ("DLI").  [AR at 11-19.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [AR at 7.]  When the Appeals Council denied plaintiff's request for review on April 8, 2014 [AR at 1-5], the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

## III.

## <u>STANDARD OF REVIEW</u>

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a

---

[1]  In his application, plaintiff alleged an onset date of December 1, 2007, which he subsequently amended at the hearing to April 1, 2010.  [AR at 75-76, 161.]

2

conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (internal quotation marks and citation omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same).   When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (internal quotation marks and citation omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

## IV.

### THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

## A.   THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the

1   claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in

2   substantial gainful activity, the second step requires the Commissioner to determine whether the

3   claimant has a "severe" impairment or combination of impairments significantly limiting his ability

4   to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.

5   If the claimant has a "severe" impairment or combination of impairments, the third step requires

6   the Commissioner to determine whether the impairment or combination of impairments meets or

7   equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404,

8   subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If

9   the claimant's impairment or combination of impairments does not meet or equal an impairment

10  in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

11  sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled

12  and the claim is denied.  Id.  The claimant has the burden of proving that he is unable to perform

13  past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie

14  case of disability is established.  Id.  The Commissioner then bears the burden of establishing

15  that the claimant is not disabled because he can perform other substantial gainful work available

16  in the national economy.  Id.  The determination of this issue comprises the fifth and final step

17  in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin,

18  966 F.2d at 1257.

19

20  **B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

21          At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since

22  April 1, 2010, the alleged onset date, through his DLI of December 31, 2010.[2]  [AR at 13.]  At step

23  two, the ALJ concluded that plaintiff has the following severe impairments:   multi-level

24  degenerative disc disease, cervical spine stenosis and neural foraminal narrowing; chronic

25  obstructive pulmonary disease; and history surgical repair bilateral shoulders.   [AR at 13-14

26  _____

27       [2]    The ALJ concluded that plaintiff "last met the insured status requirements of the Social
     Security Act on December 31, 2010."  [AR at 13.]

28

(citation omitted).]   The ALJ found that plaintiff's medically determinable impairments of generalized anxiety disorder and polysubstance abuse, considered singly and in combination, "did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore nonsevere." [AR at 14.]   At step three, the ALJ determined that through the DLI, plaintiff did not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listings. [Id. at 15.]   The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[3] to perform light work as defined in 20 C.F.R. § 404.1567(b),[4] except:

> [Can] lift/carry 10 pounds frequently, 20 pounds occasionally with right upper extremity, but only 10 pounds with left upper extremity; requires cane for long distance walking; sit at least 6 hours of an 8 hour day; stand/walk at least 6 hours of an 8 hour day; occasionally climb, balance, stoop, kneel, crouch, crawl; no climbing ladders; no concentrated exposure to dust, fumes, respiratory irritants; occasional overhead reaching bilaterally.

[Id.]   At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that plaintiff is unable to perform any of his past relevant work as a truck driver or as a stone cutter. [AR at 17.]   At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that there are jobs existing in significant numbers in the national economy that plaintiff can perform, including work as a "cashier" (Dictionary of Occupational Titles ("DOT") No. 211.462-010), and "usher/lobby attendant" (DOT No. 344.677-004). [AR at 18, 64.]   Accordingly, the ALJ

---

[3]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[4]   "Light work" is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

determined that plaintiff was not disabled at any time from the alleged onset date of April 1, 2010, through December 31, 2010, plaintiff's DLI.  [AR at 18.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when she:  (1) evaluated the medical evidence concerning plaintiff's cervical spine impairment; (2) found plaintiff's testimony regarding his subjective symptoms and functional limitations prior to his DLI was not credible; (3) failed to provide germane reasons for rejecting the statement of a lay witness; and (4) assessed plaintiff's physical RFC prior to the DLI.  [Joint Stipulation ("JS") at 2-3.]  As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

## A.    EVALUATION OF THE MEDICAL EVIDENCE

Plaintiff contends that in assessing plaintiff's cervical spine impairment, the ALJ failed to consider the probative value of medical evidence post-dating plaintiff's DLI of December 31, 2010. [JS at 3.]

### 1.    Background

Following is a chronology of plaintiff's pre- and post-DLI medical treatment [see also JS at 3-6]:

- April 25, 2010 [AR at 448-52]:  plaintiff was seen in the emergency department at St. Mark's Hospital in Utah "due to left sided neck pain with progressively worsening pain and now radiation into the left shoulder and arm down to the elbow"; plaintiff reported the problem had been going on for "the past 1-2 months and [was] progressively worse"[5]; he appeared to be in pain and was "in moderate distress"; he exhibited limited range of motion in the left shoulder, left upper arm, and left elbow; a CT scan was ordered;

---

[5]    Plaintiff testified that he was assaulted in April 2010, and this was the beginning of his neck and shoulder pain.  [AR at 54.]

- April 25, 2010 [AR at 450]:  a CT of the cervical spine showed "degeneration, but a preserv[ed] central canal" and "of note several levels of neuroforaminal stenosis"; the diagnoses were acute neck pain, acute left cervical radiculopathy, and neuroforaminal stenosis; an MRI of the cervical spine was recommended;

- May 19, 2010 [AR at 461-62]:   plaintiff was seen in the emergency department at the University of Utah for "neck pain and radiculopathy"; it was noted that his pain had worsened since April 25, 2010; associated symptoms included muscle pain, specific weakness, left arm weakness, and left posterior arm paresthesias;

- May 19, 2010 [AR at 466]:  imaging studies showed grade 1 anterolisthesis of C4 on C5, mild disc space narrowing at C4-C5, moderate disc space narrowing at C5-C6 and C6-C7, and uncovertebral joint arthropathy at these levels; the impression stated was multilevel degenerative change with grade 1 anterolisthesis of C4 on C5 and moderate disc space narrowing at C5-C6 and C6-C7;

- May 19, 2010 [AR at 467-68]:  an MRI of the cervical spine showed multilevel degenerative disc disease and facet arthropathy, resulting in multilevel spinal stenosis and neural foraminal narrowing; severe spinal stenosis at C4-C5; severe neural foraminal narrowing bilaterally at C6-C7, and on the right side at C5-C6;

- October 13, 2010 [AR at 487-88]:  plaintiff was seen in Utah by his primary treating provider, certified physician's assistant ("PA-C") Thomas T. Jones, for complaints of neck pain with "generalized intermittent muscle weakness [a]nd sensory loss mostly of the left side of his body and is confined to a wheel chair which [he] is able to get out of but not without sever[e] instability and muscle weakness"; plaintiff told PA-C Jones that the orthopedic doctor and neurosurgeon at the university of Utah had recommended surgery; on physical examination, PA-C Jones noted that plaintiff "is very unstable and weak getting out of his chair," "motor strength is decreased over all esp on the left and he is aided in standing by his wife and myself"; and "[t]here is some pain across the back of his neck and his upper t-spine[,] he reports that most of his weakness is on the left but he seems to be weak overall generally"; PA-C Jones stated, "definitely agree that he is not able to work and will likely not be able to work in the future"; PA-C Jones also stated that plaintiff "has been recommended for surgery by ortho and neurosurgery to correct this";

- November 23, 2010 [AR at 490]:  plaintiff, who had "recently moved . . . from Utah," presented at the Sierra Vista Family Care Clinic ("Sierra Vista") in Chatsworth, California, with complaints of neck pain/swelling, weakness,

numbness, headaches, and back pain; he told the provider Timothy J. Donahue, M.D., that he had been on the schedule for neck surgery in Utah; Dr. Donahue noted plaintiff's neck was tight and there was limited range of motion in his muscles; Dr. Donahue referred plaintiff to neurosurgery;

• December 19, 2010 [AR at 491]:  plaintiff presented at Sierra Vista complaining of an exacerbation of his chronic obstructive pulmonary disease;

• December 22, 2010 [AR at 494-95]:  an MRI of the cervical spine was conducted and found degenerative disc disease with posterior spondylosis impressing the adjacent thecal disc at the C4-C5, C5-C6, and C6-C7 levels, mild central spinal canal stenosis at the C4-C5 and C5-C6 levels, and mild to moderate central spinal canal stenosis at the C6-C7 level; the report also noted that the spondylosis "may result in minimal impression of the adjacent cervical spinal cord at the C6-C7 disc level," and that there also was moderate left neural foraminal narrowing at C4-C5, mild left and moderate right C5-C6 neural foraminal narrowing, and severe bilateral C6-C7 neural foraminal narrowing;

• January 3, 2011 [AR at 496]: plaintiff presented at Sierra Vista for evaluation of his neck pain and chronic obstructive pulmonary disease; it was recommended he continue wearing the cervical collar;

• February 1, 2011 [AR at 509]: plaintiff presented at Sierra Vista for his chronic neck pain, complaining of numbness in his right upper extremity; the note indicates that plaintiff is awaiting a neurosurgery evaluation and will follow up with Dr. Herman for a surgery appointment; plaintiff was given a new cervical collar;

• February 15, 2011 [AR at 512-13]: Abirami Muthukumaran, M.D., completed a neurological evaluation and noted limited range of motion of the cervical spine and dermatomal sensory loss in the upper extremities bilaterally, diminished sensation in the right lower leg, and antalgic gait; Dr. Muthukumaran recommended an EMG nerve conduction study, and noted plaintiff would "probably benefit from referr[al] to Physical Therapy and epidural injection before referring to Neurosurgery";

• February 17, 2011 [AR at 514-15]:  Dr. Muthukumaran interpreted the nerve conduction study which showed "electrophysiological evidence of . . . multilevel C5-C8[ ] chronic radiculopathies bilaterally, moderate severity"; Dr. Muthukumaran now stated that plaintiff "needs to see Neurosurgeon for further evaluation";

• February 17, 2011 [AR at 521]:  Dr. Muthukumaran's full report interpreting the nerve conduction and EMG results further stated that "[t]his is a very

abnormal study" and "[t]here is electrophysiological evidence of . . . chronic bilateral multi-level C5-C8 radiculopathies, subacute to chronic of moderate severity affecting bilateral upper extremities"; Dr. Muthukumaran recommended that "[g]iven the abnormal MRI[6] and the nerve conduction study, the patient needs to be evaluated by a neurosurgeon";

- February 28, 2011 [AR at 523]:  plaintiff presented for an evaluation complaining of migraine headaches for two days and chronic neck pain; the note indicates that plaintiff was awaiting cardiology clearance before surgery could be scheduled;

- April 5, 2011 [AR at 526]:  plaintiff presented for a cardiac evaluation prior to cervical neck surgery; he was wearing his cervical collar;

- May 19, 2011 [AR at 531]:  plaintiff underwent another MRI of the cervical spine; the results showed multilevel degenerative disc disease and facet arthropathy resulting in severe multilevel spinal stenosis at C4-C5, and severe neural foraminal narrowing on the left at C4-C5 and C5-C6, and severe bilaterally at C6-C7;

- May 24, 2011 [AR at 568]:  plaintiff presented to Dr. Muthukumaran who indicated that plaintiff is "well known to me," and was complaining of increased severe bilateral pain in his arms and legs; plaintiff was wearing his cervical collar; Dr. Muthukumaran noted plaintiff's cervical radiculitis was "quite severe" with bilateral lower extremity pain and weakness; he also noted that plaintiff's gait was abnormal with increased pain over the last week;

- May 31, 2011 [AR at 565]:  a treatment note signed by Dr. Flom indicates the neurosurgeons were waiting for clearance for the surgery [id. ("Dr. Herman / Kessey thought they need surgery . . . but need clearance")];

- June 24, 2011 [AR at 577]:  Dr. Muthukumaran stated that plaintiff "has cervical spinal stenosis with severe radiculopathy affecting bilateral upper extremities and neck"; he also noted that plaintiff "has abnormal neurological examination[,] MRI of the spine + EMG testing," is "awaiting surgery," and "has polyneuropathy affecting legs (bilaterally), and low back pain"; he concluded that as a result, plaintiff "currently . . . is 100% disabled";

- July 1, 2011 [AR at 578-80]:  plaintiff underwent a neurosurgical consultation with Kofi Kessey, M.D.; Dr. Kessey confirmed plaintiff's diagnosis of cervical stenosis and recommended surgery to prevent or slow down the progression

---

[6]  Dr. Muthukumaran appears to be referring to the December 22, 2010, MRI.  [AR at 494-95.]

9

of plaintiff's symptoms;

- September 12, 2011 [AR at 586-88]:  Dr. Kessey performed a C3-C6 laminectomy and bilateral C3-C7 fusion with instrumentation; Dr. Kessey's pre- and post-operative diagnoses were progressive cervical myelopathy, cervical stenosis, and neck pain;

- November 14, 2012 [AR at 590-92.]:  Dr. Flom at the Sierra Vista Medical Clinic responded to a Physical Residual Functional Capacity Questionnaire; she noted she was plaintiff's primary care doctor and saw him monthly; she described his symptoms as chronic pain aggravated by prolonged sitting, standing, or strenuous activity, chronic fatigue, and frequent and debilitating headaches; she reported he had decreased range of motion in the cervical and lumbar spine, poor air exchange and wheeze, and chronic pain; she opined he can lift and/or carry less than 10 pounds occasionally, can stand and/or walk for less than two hours in an eight-hour day, can sit less than six hours in an eight-hour day; would need frequent breaks ("every 30-60 min on average"); no pushing and/or pulling as that aggravates the cervical and lumbar spine pain; can occasionally bend and balance but never climb, crouch, kneel, or crawl; can occasionally handle and finger, but never reach because plaintiff's cervical spine fusion and his pain limit his range of motion; needs to avoid extremes in temperature and fumes, chemicals, and gases; and is unable to operate heavy machinery.

2.    **The ALJ's Decision**

In her decision, the ALJ summarized plaintiff's treatment notes from April 25, 2010, through December 22, 2010.  [AR at 14.]  After also summarizing plaintiff's testimony [AR at 16], the ALJ stated:

> The claimant's own testimony supports a finding that the claimant's symptoms increased substantially only after the date last insured.  He stated that the surgery in September 2011 did not improve his neck pain and increased his back pain.  The claimant stated that his back pain had been manageable prior to the surgery.
>
>      . . . .
>
> The undersigned gives little weight to the opinion of Dr. Flom . . . as it does not appear that Dr. Flom treated the claimant prior to the date last insured, and therefore would not have any firsthand knowledge as to the claimant's condition at that time.  Her opinion appears to contemplate the claimant's current restrictions, as Dr. Flom notes that the claimant "had a fusion in the [cervical] spine so he is limited by [range of motion] and pain."  While the claimant was seen at Sierra Vista Medical Clinic, where Dr. Flom practices, the treatment records from Sierra Vista show that the claimant was first seen in November 2010 and in December 2010, the claimant only complained of a chronic obstructive pulmonary disease exacerbation.

[AR at 17 (citing AR at 589-93).]  The ALJ mentioned that plaintiff "eventually underwent neck surgery, after the date last insured."  [AR at 14.]  She did not mention any of plaintiff's treatment notes after December 22, 2010, nor did she evaluate any of the medical evidence after that date. [See generally AR at 14-17.]  Indeed, she never truly "evaluated" *any* of the medical evidence from plaintiff's treating sources.  [See AR at 14.]  Instead, the ALJ credited the February 16, 2011, opinion of the state agency medical consultant [AR at 555-60] who opined that plaintiff was capable of performing light work beginning in April 2010.  [AR at 17 (citing AR at 559).]  The ALJ noted that the consultant's report was supported by "medical signs and laboratory findings and . . . [was] consisten[t] with the record."  [AR at 17.]  She specifically noted the consultant's finding that plaintiff "had normal strength and gait, even after the date last insured, and there were no hospitalizations or frequent exacerbations of pain that would suggest that the claimant was not capable of performing light work as further limited herein."  [Id. (citing AR at 559).]

The Ninth Circuit has specifically held that "medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the preexpiration condition."  Taylor v. Comm'r of Soc. Sec. Admin., 569 F.3d 1228, 1233 (9th Cir. 2011) (internal quotation marks and citation omitted) (quoting Lester, 81 F.3d at 832).  Thus, while the ALJ has to consider the limitations and impairments that were in existence prior to the DLI, she cannot ignore probative evidence simply because it post-dates that time.  Here, plaintiff's impairment of cervical pain has existed since approximately April 2010, ninth months prior to his DLI.  [See AR at 448-52.] Moreover, plaintiff's neck pain formed the basis of his November 3, 2010, claim for benefits[7] and was the subject of the ALJ's inquiry during the December 11, 2012, hearing.  [AR at 48-76, 161.] In fact, the ALJ stated at the hearing that she "assum[ed] that [plaintiff's] testimony about [his] limitations and pain before that surgery was pretty consistent with what it was like up until

---

[7]    The agency field officer who interviewed plaintiff on November 5, 2010, for purposes of completing his application for benefits, commented that plaintiff "had a neck brace, walked really slow, . . . had trouble reaching the form to sign . . . [and] his sister had to place the form on his laps [sic] to sign it, he had limited neck movement.  His sister helped him thru out the interview . . . .  After the interview was completed, his sister had to move the car to the front because he couldn't walk as much."  [AR at 193.]

1   December of 2010," and plaintiff agreed that was true.  [AR at 57.]

2          Reviewing the chronology of plaintiff's medical treatment outlined above, the medical

3   evaluations regarding plaintiff's neck pain made after the expiration of his insured status could very

4   well be relevant to the evaluation of his pre-DLI condition.  Plaintiff did not move to California until

5   sometime between October 13, 2010, and November 23, 2010, only a short time prior to his DLI.

6   Between April 2010 and prior to moving to California, it appears plaintiff had been recommended

7   for surgery by orthopedic and neurosurgical consultants at the University of Utah.  [AR at 487.]

8   On November 23, 2010, when he presented at Sierra Vista for care, he was referred to

9   neurosurgery that same day.  [AR at 490.]  On February 1, 2011, he was still waiting for the

10  neurosurgery evaluation [AR at 509], and on February 15, 2011, he underwent a neurological

11  evaluation completed by Dr. Muthukumaran.  [AR at 512-13.]  Although on that date Dr.

12  Muthukumaran stated that plaintiff might benefit from physical therapy and epidural injection

13  before referring him to neurosurgery, two days later, after reviewing the abnormal results of the

14  nerve conduction study and the December 22, 2010, MRI, Dr. Muthukumaran recommended

15  evaluation by a neurosurgeon.  [AR at 521.]  Dr. Flom's May 31, 2011, note indicated that plaintiff

16  was still waiting for clearance to consult with a neurosurgeon.  [See, e.g., AR at 565.]  On July 1,

17  2011, the day of the neurosurgical consultation, based at least in part on plaintiff's December 22,

18  2010, MRI scan, Dr. Kessey recommended surgery, and that surgery was performed two months

19  later on September 12, 2011.  [AR at 586-88.]

20         Here, however, in reaching her conclusion, the ALJ selectively relied on the state agency

21  consultant's February 16, 2011, opinion, which in turn selectively relied on plaintiff's pre-DLI

22  records.[8]  See Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001) (holding that an ALJ

23  _____

24         [8]   The Court notes that the opinion of a nonexamining physician cannot by itself constitute
    substantial evidence that justifies the rejection of the opinion of either an examining physician or
25  a treating physician.  Pitzer v. Sullivan, 908 F.2d 502, 506 n.4 (9th Cir. 1999).  Such a report may
    serve as substantial evidence when it is "supported by other evidence in the record and [is]
26  consistent with it."  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  Because the
    nonexamining consultant did not review the entirety of the medical record, including post-DLI
27  records, and appears to have selectively reviewed the pre-DLI records, the Court cannot

28

1    cannot selectively rely on some entries in plaintiff's records while ignoring others); Aukland v.

2    Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) ("[T]he [ALJ]'s decision 'cannot be affirmed simply

3    by isolating a specific quantum of supporting evidence.'") (citing Sousa v. Callahan, 143 F.3d

4    1240, 1243 (9th Cir. 1998)).   For example, the ALJ specifically mentions that "the medical

5    consultant noted that the claimant had normal strength and gait, even after the date last insured."

6    [AR at 17 (citing AR at 559 ("boxes checked [on 1/3/11 treatment note] indicating normal gait,

7    normal strength/tone")).]   A review of the document the consultant was referring to, however,

8    nowhere indicates that plaintiff's gait was "normal" or that he had "normal" strength.   [AR at 496.]

9    In fact, the check boxes on that form appear to be used only to indicate the specific examinations

10   that were done during the visit, e.g., the doctor examined plaintiff's gait and his muscle

11   strength/tone, as well as his general appearance, vital signs, ears, respiration, heart, abdomen,

12   edema, neck, spine, left upper extremity, and right upper extremity, among other things. [Id.] The

13   treatment note itself indicates that plaintiff suffers from chronic neck pain, cervical stenosis, and

14   cervical radiculopathy, and recommended that plaintiff continue wearing his cervical collar.  [Id.]

15        Perhaps more tellingly, the ALJ did not mention other records the consultant reviewed --

16   notes indicating that plaintiff had 3-4/5 strength on his left upper extremity, decreased sensation

17   in his posterior left upper extremity, was unstable and weak getting out of his chair, and had

18   decreased sensation in his left upper extremity.  [AR at 559.]  The consultant also completely

19   failed to mention the December 22, 2010, MRI results; nor did he have the benefit of reviewing any

20   of the treatment notes beyond January 3, 2011 -- including Dr. Muthukumaran's February 17,

21   2011, report, and Dr. Kessey's July 1, 2011, report -- both of which relied on the results of the

22   December 22, 2010, MRI conducted only twelve days after plaintiff's DLI.  [AR at 559; see also

23   AR at 494-95, 521, 579.]  Nor did either the ALJ or the consultant discuss the October 2011

24   opinion of PA-C Jones that plaintiff was "not able to work and will likely not be able to work in the

25   future . . . ," or Dr. Muthukumaran's June 24, 2011, opinion that plaintiff "currently . . . is 100%

26   _____

27   confidently conclude that it is supported by or consistent with the other evidence in the record.

28

1  disabled."[9]  [AR at 488.]

2  Defendant argues that "the evidence calls into question the seriousness of Plaintiff's

3  cervical problems prior to his [DLI]" because "[a]s the ALJ noted, when Plaintiff began treatment

4  with Sierra Vista Family Care on December 19, 2010, he only 'complained of a chronic obstructive

5  pulmonary disease exacerbation.'"  [JS at 8 (citing AR at 14 (citing AR at 491)).]  This argument

6  is neither accurate nor persuasive.  In fact, when plaintiff began treatment at Sierra Vista -- on

7  November 23, 2010 -- his neck pain appears to be the *first* thing he complained about.  [See AR

8  at 490.]  That he had to return less than a month later for another medical issue in no way detracts

9  from the treatment he received in 2010 and beyond relating to his cervical impairment.

10  Additionally, the ALJ's statements that plaintiff's "own testimony supports a finding that [his]

11  symptoms increased substantially only after the date last insured," or that plaintiff testified the

12  surgery "did not improve his neck pain," also lack merit.  [AR at 17.]  In fact, the ALJ

13  mischaracterizes plaintiff's testimony.  Plaintiff actually testified that his *back* problem developed

14  after the neck surgery and that before December of 2010, his "back was pretty manageable."  [AR

15  at 57-58.]  He also did not testify that the surgery "did not improve his neck pain" -- he stated that

16  the surgery gave him "some relief," although he does still have some "horrible days" [AR at 51-52],

17  but that after the surgery his cervical range of motion, pain, and numbness had improved.  [AR

18  at 56, 61.]  Moreover, as previously discussed, plaintiff also testified that the limitations and pain

19  he suffered as a result of his cervical impairment before the September 2011 surgery, were

20  consistent with his limitations and pain up until December 2010, his DLI.  [AR at 57.]

21  _____

22  [9]   "[T]he ALJ may only reject a treating . . . physician's uncontradicted medical opinion based on
clear and convincing reasons."  Carmickle, 533 F.3d at 1164 (internal quotation marks and citation

23  omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).  "Where such an opinion is
contradicted, however, it may be rejected for specific and legitimate reasons that are supported by

24  substantial evidence in the record."  Carmickle, 533 F.3d at 1164 (internal quotation marks and citation
omitted); Ryan, 528 F.3d at 1198; Ghanim v. Colvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014); Garrison

25  v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014).  The ALJ can meet the requisite specific and legitimate
standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence,

26  stating his interpretation thereof, and making findings."  Reddick, 157 F.3d at 725.  The ALJ "must set

27  forth [her] own interpretations and explain why they, rather than the [treating or examining] doctors',
are correct."  Id.  The ALJ did not do so here.

28

1    Accordingly, based on the above, the Court cannot find that the ALJ properly evaluated the

2    medical evidence of record concerning plaintiff's cervical spine impairment or that substantial

3    evidence supported the ALJ's RFC determination.  Nor does the Court find the error harmless

4    because had the pre- and post-DLI evidence been properly considered, it might have changed the

5    outcome of the ALJ's decision.[10]  Remand is warranted on this issue.

6

7    **B.    CREDIBILITY**

8    Plaintiff contends that the ALJ improperly discounted plaintiff's testimony concerning his

9    subjective symptoms and functional limitations prior to his DLI.  [JS at 12.]  Specifically, plaintiff

10   argues that the ALJ failed to present any specific, clear and convincing reasons supported by

11   substantial evidence in the record, for discounting his subjective complaints.  [Id.]

12   "To determine whether a claimant's testimony regarding subjective pain or symptoms is

13   credible, an ALJ must engage in a two-step analysis."  Lingenfelter v. Astrue, 504 F.3d 1028,

14   1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented

15   objective medical evidence of an underlying impairment 'which could reasonably be expected to

16   produce the pain or other symptoms alleged.'"  Id. at 1036 (quoting Bunnell v. Sullivan, 947 F.2d

17   341, 344 (9th Cir. 1991) (en banc)).  Second, if the claimant meets the first test, the ALJ may

18   reject the claimant's testimony about the severity of his symptoms "only upon (1) finding evidence

19   of malingering, or (2) expressing clear and convincing reasons for doing so."  Benton v. Barnhart,

20   331 F.3d 1030, 1040 (9th Cir. 2003).  Factors to be considered in weighing a claimant's credibility

21   include:  (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's

22   testimony or between the claimant's testimony and his conduct; (3) the claimant's daily activities;

23   (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the

24   nature, severity, and effect of the symptoms of which the claimant complains.  See Thomas v.

25   Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also Ghanim, 763 F.3d at 1163; 20 C.F.R. §§

26

27   _____

     [10]   The Court expresses no opinion on the merits.

28

15

1    404.1529(c), 416.929(c).

2         Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ

3    did not find "affirmative evidence" of malingering [see generally, AR at 11-19], the ALJ's reasons

4    for rejecting a claimant's credibility must be specific, clear and convincing. Burrell v. Colvin, __

5    F.3d __, 2014 WL 7398892, at *2 (9th Cir. Dec. 31, 2014) (citing Molina v. Astrue, 674 F.3d 1104,

6    1112 (9th Cir. 2012)). "General findings [regarding a claimant's credibility] are insufficient; rather,

7    the ALJ must identify what testimony is not credible and what evidence undermines the claimant's

8    complaints." Id. at *4 (quoting Lester, 81 F.3d at 834) (internal quotation marks omitted). The

9    ALJ's findings "must be sufficiently specific to allow a reviewing court to conclude the adjudicator

10   rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a

11   claimant's testimony regarding pain." Bunnell, 947 F.2d at 345-46 (internal quotation marks and

12   citation omitted). A "reviewing court should not be forced to speculate as to the grounds for an

13   adjudicator's rejection of a claimant's allegations of disabling pain." Id. at 346. As such, an

14   "implicit" finding that a plaintiff's testimony is not credible is insufficient. Albalos v. Sullivan, 907

15   F.2d 871, 874 (9th Cir. 1990) (per curiam).

16         Here, the ALJ reviewed plaintiff's testimony and found plaintiff "not fully credible" for the

17   following reason:

18         The claimant's own testimony supports a finding that the claimant's
19       symptoms increased substantially only after the date last insured. He stated that the
          surgery in September 2011 did not improve his neck pain and increased his back
20       pain. The claimant stated that his back pain had been manageable prior to the
          surgery.

21   [AR at 17.]

22         As previously discussed, this statement mischaracterizes plaintiff's testimony. As such, the

23   sole reason given by the ALJ for discounting plaintiff's credibility does not sufficiently allow the

24   Court to conclude that the ALJ did so on permissible grounds. Remand is warranted on this issue.

25

26   **C.    LAY WITNESS TESTIMONY**

27         On December 3, 2010, plaintiff's sister, Janiece Lackey, prepared a third-party function

28

report.  [AR at 212-19.]  The ALJ never mentioned this report in the decision.

An ALJ may consider lay witness testimony to determine the severity of a claimant's impairments and how the impairments affect his ability to work.  <u>Stout v. Comm'r of Social Sec. Admin.</u>, 454 F.3d 1050, 1053 (9th Cir. 2006); 20 C.F.R. §§ 404.1513(d)(4), (e), 416.913(d)(4), (e). Lay witnesses include spouses, parents and other care givers, siblings, other relatives, friends, neighbors, and clergy.  20 C.F.R. § 404.1513(d)(4).  Thus, lay witness testimony by friends and family members who have the opportunity to observe a claimant on a daily basis "constitutes qualified evidence" that the ALJ must consider.  <u>See</u> <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1231-32 (9th Cir. 1987); <u>Smolen</u>, 80 F.3d at 1289 (testimony from lay witnesses, who see the plaintiff on a daily basis and are often family members, is of particular value).  The ALJ may discount the testimony of lay witnesses only for "reasons that are germane to each witness."  <u>Dodrill</u>, 12 F.3d at 919; <u>Regennitter v. Comm'r of Soc. Sec. Admin.</u>, 166 F.3d 1294, 1298 (9th Cir. 1999).

Here, as the Commissioner concedes [JS at 20], the ALJ never mentioned Ms. Lackey's report.  Because the case is being remanded for reconsideration of the medical evidence and plaintiff's credibility, the ALJ on remand should properly consider the report of this lay witness.

**D.  PLAINTIFF'S RFC PRIOR TO THE DLI**

Plaintiff contends that because the ALJ erred in the evaluation of the medical evidence concerning plaintiff's cervical spine impairment, and in considering plaintiff's subjective symptom testimony and the lay witness statement, the RFC finding that plaintiff had the capacity to perform a modified range of light work was not supported by substantial evidence in the record.  [JS at 22-23.]

Because the case is being remanded for reconsideration of the medical evidence,  plaintiff's credibility, and the lay witness report, the ALJ on remand shall also reconsider plaintiff's RFC.

/

/

17

1

**VI.**

2

**REMAND FOR FURTHER PROCEEDINGS**

3     The Court has discretion to remand or reverse and award benefits. <u>McAllister v. Sullivan</u>,

4     888 F.2d 599, 603 (9th Cir. 1989).   Where no useful purpose would be served by further

5     proceedings, or where the record has been fully developed, it is appropriate to exercise this

6     discretion to direct an immediate award of benefits. <u>See</u> <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028,

7     1041 (9th Cir. 2007); <u>Benecke v. Barnhart</u>, 379 F.3d 587, 595-96 (9th Cir. 2004).   Where there are

8     outstanding issues that must be resolved before a determination can be made, and it is not clear

9     from the record that the ALJ would be required to find plaintiff disabled if all the evidence were

10    properly evaluated, remand is appropriate. <u>See</u> <u>Benecke</u>, 379 F.3d at 593-96.

11    In this case, there are outstanding issues that must be resolved before a final determination

12    can be made.   In an effort to expedite these proceedings and to avoid any confusion or

13    misunderstanding as to what the Court intends, the Court will set forth the scope of the remand

14    proceedings. First, because the ALJ failed to properly consider the medical evidence concerning

15    plaintiff's cervical spine impairment, the ALJ on remand shall reassess the entire medical record,

16    both pre- and post-DLI.   In assessing the medical opinion evidence, the ALJ must explain the

17    weight afforded to each opinion and provide legally adequate reasons for any portion of an opinion

18    that the ALJ discounts or rejects, including a legally sufficient explanation for crediting one doctor's

19    opinion over any of the others.   Next, the ALJ shall reassess plaintiff's credibility and provide

20    specific, clear and convincing reasons for discrediting his testimony, if warranted.   The ALJ shall

21    also assess the third-party function report completed by plaintiff's sister and provide reasons

22    germane to the witness for discounting that report, if warranted.   Finally, the ALJ shall reassess

23    plaintiff's RFC, and determine, at step five, with the assistance of a VE if necessary, whether there

24    are jobs existing in significant numbers in the national economy that plaintiff can still perform.[11]

25

26

27    [11]   Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to return to his past relevant work.

28

18

## VI.

## <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  February 2, 2015

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

19